# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRYAN COHEN, individually and on behalf of all other persons similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| NORTHEAST RADIOLOGY, P.C.  and ALLIANCE HEALTHCARE SERVICES, INC., | |
| Defendants. | |

Plaintiff, Bryan Cohen ("Plaintiff"), individually and on behalf of all others similarly situated, complains upon knowledge as to his own acts and upon information and belief as to all other matters against Northeast Radiology, P.C. ("Northeast Radiology") and Alliance HealthCare Services, Inc. ("Alliance HealthCare") (collectively, "Defendants") as follows:

## <u>INTRODUCTION</u>

1.      This case arises from Defendants' failure to adequately safeguard highly sensitive Electronic Protected Health Information ("e-PHI") collected from Plaintiff and other Class Members.

2.      In an article published by TechCrunch on January 10, 2020, independent cybersecurity researchers from Greenbone Networks announced that they had uncovered major flaws in Northeast Radiology's and Alliance HealthCare's systems that permitted unauthorized access to more than 1.2 million patients' medical records. This included at least 61 million x-rays, CT scans, MRIs, and/or other imaging studies that contained extremely sensitive e-PHI, such as medical test results, diagnoses, and procedure descriptions, in addition to the patients' names, social security numbers ("SSNs"), dates of birth, and addresses.

1

3.      The Greenbone research team explained that it had previously notified Defendant Northeast Radiology of their findings. However, Northeast Radiology ignored these results choosing instead to continue operating systems that easily allowed unauthorized third parties to access patient e-PHI for at least several months. In fact, Northeast Radiology only made changes to its systems in an attempt to reduce the risk of unauthorized access *after* reporters from TechCrunch repeatedly questioned its lax security practices, at least a month after Greenbone first warned the organization of the exposure.

4.      Such careless handling of e-PHI is prohibited by federal and state law. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires healthcare providers, like Defendants, and their business associates to safeguard patient information through a multifaceted approach that includes, among other things: (a) ensuring the confidentiality, integrity, and availability of all e-PHI they create, receive, maintain or transmit; (b) proactively identifying and protecting against reasonably anticipated threats to the security or integrity of the information; (c) protecting against reasonably anticipated, impermissible uses or disclosures; (d) putting in place the required administrative, physical and technical safeguards; (e) implementing policies and procedures to prevent, detect, contain, and correct security violations; (f) effectively training their workforce regarding the proper handling of e-PHI; and (g) designating individual security and privacy officers to ensure compliance.

5.      Defendants' failure to comply with HIPAA and other laws or guidelines by failing to take reasonable steps to safeguard patient information has directly resulted in injury to Plaintiff and the Class. For example, since being a patient at Northeast Radiology, Plaintiff Cohen' identity was stolen and used to take out fraudulent loans in his name and to withdraw money from his bank account. Plaintiff Cohen remains at risk of further identity theft because,

unlike a credit card, there is no way to cancel the e-PHI that was accessed by unauthorized third parties, who can continue to exploit this information at his expense.

6.    In addition to losing money, Plaintiff Cohen has expended considerable time and effort attempting to mitigate the adverse effects of Defendants' failure to adequately safeguard his e-PHI, including hours spent placing a "lock" on his file with credit agencies, contacting financial institutions to inform them of fraud and to prevent future attacks, closing bank accounts, and closely reviewing and monitoring credit reports and accounts for unauthorized activity. Plaintiff and Class Members will also be required to purchase credit and identity monitoring services to alert them of potential misappropriation of their identity and to combat the risk of further identity theft, incurring an out-of-pocket cost to prevent and mitigate future losses resulting from Defendants' misconduct.

7.    Given the secret nature of Defendants' policies, procedures, systems, and controls, Plaintiff believes that further evidentiary support for his claims will be unearthed after a reasonable opportunity for discovery.

## PARTIES

### A.    Plaintiff

8.    Plaintiff Bryan Cohen is a resident of Westchester County, New York. Plaintiff Cohen was a patient of Defendant Northeast Radiology in December 2016. At the time of his visit, Plaintiff Cohen provided Northeast Radiology with personal information, including his name, address and SSN. This information, along with other e-PHI associated with Plaintiff's treatment at Northeast Radiology was stored electronically on Defendants' servers.

9.    Plaintiff Cohen experienced multiple instances of identity theft after being treated at Northeast Radiology. For example, in September 2019, Plaintiff was contacted by a lender

regarding a loan that was fraudulently taken out in his name. Significantly, the fraudulent borrower provided the same personal information that Plaintiff had given to Defendant Northeast Radiology including, his name, address, and SSN.

10.    Plaintiff Cohen has also experienced multiple instances where funds were fraudulently withdrawn from his bank account since visiting Northeast Radiology.

11.    Plaintiff continues to remain at risk of identity theft as a result of Northeast Radiology's failure to properly secure his e-PHI.

**B.    Defendants**

12.    Defendant Northeast Radiology is a privately-held New York Professional Corporation with its principal place of business in Brewster, New York. Founded in 1996, Northeast Radiology offers screening and diagnostic imaging services, including MRIs, CT scans, PET scans, and ultrasounds to patients from five locations in New York and Connecticut.

13.    Defendant Alliance HealthCare is a Delaware corporation with its principal place of business in Irvine, California. Alliance HealthCare provides outsourced medical services, *i.e.*, takes over the operation of a practice group within an existing hospital or healthcare system. Currently, it operates radiology, oncology, and interventional medicine practices for more than 1,100 hospitals and other healthcare partners in 46 states.

14.    Alliance HealthCare also operates more than 600 radiology systems, ranging from mobile MRI and PET/CT units that are loaded onto trucks to more than 100 fixed-site radiology installations.

15.    In August 2018, Defendant Alliance HealthCare announced a partnership with Northeast Radiology in which Northeast Radiology's New York and Connecticut offices would become part of Alliance HealthCare's radiology division and operate as one of Alliance

HealthCare's fixed-site installations.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

17.    This Court has personal jurisdiction over Defendant Northeast Radiology because it maintains its principal executive offices in Brewster, New York, is registered to conduct business in New York, regularly conducts business in New York, and has sufficient minimum contacts in New York. Defendant Northeast Radiology intentionally avails itself of this jurisdiction by conducting its corporate operations here and promoting, selling, and marketing Northeast Radiology's services to resident New York consumers and entities.

18.    This Court has personal jurisdiction over Alliance HealthCare, as it has sufficient minimum contacts in New York. For example, Alliance HealthCare purposefully availed itself of the privileges and benefits associated with conducting business in this State, by, among other things, reaching into New York to establish a partnership with Defendant Northeast Radiology by which Northeast Radiology's New York offices became part of the Alliance HealthCare radiology group. Thus, Alliance HealthCare regularly conducts business in New York by operating Northeast Radiology as part of its approximately 100 fixed-site radiology systems, in addition to promoting, selling, and marketing Northeast Radiology's services to New York consumers such as Plaintiff.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Northeast Radiology's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Picture Archiving and Communication Systems and the DICOM Standard**

20.      In the days before computer technology, when a patient went for medical imaging, including ultrasound, MRI, and/or CT scans, the provider would store the results as physical image files in a format similar to an X-ray film. Reviewing those images at a later date required manually accessing those physical files from storage. Sharing images between providers required transporting the physical image files to them for review.

21.      Radiologists looking for a more convenient way to store and access medical images developed the Picture Archiving and Communication System ("PACS") in the 1980s. Each PACS consists of four components: (1) an imaging machine (*e.g.*, CT, MRI, or ultrasound), (2) a network for the transmission of images and patient information, (3) workstations for reviewing and interpreting images, and (4) a system where images and reports are stored (referred to as the "PACS server").

22.      All PACSs operate according to the Digital Imaging and Communications in Medicine ("DICOM") standard. DICOM was developed by the American College of Radiology and National Electrical Manufacturers Association to create a universal standard for storing, transmitting, and decoding medical images. Prior to the adoption of DICOM, manufactures of imaging machines used proprietary formats for storing digital medical images and networking protocols. This made it difficult for doctors and imaging providers to share medial images because devices manufactured by different vendors used different standards and thus could not communicate with one another.

23.      The DICOM standard addressed this issue by creating a new image format (identified by the .dcm extension) for the storage of medical images and related data. All DICOM-compliant imaging machines, workstations, and servers are required to process and read

DICOM files.

24.     Also adopted as part of the DICOM standard were specific network requirements regarding not only how imaging files were transmitted but how various DICOM-enabled devices or applications communicate with each other. For example, the DICOM standard requires information transmitted among PACSs to be sent to specific network communication endpoints (called "ports"). So long as the DICOM specific ports are enabled, DICOM files can be exchanged between PACSs or viewed using a DICOM viewer.

### B.     PACS and the Internet

25.     DICOM has continued to evolve since the 1980s with ongoing changes in technology, like the proliferation of the Internet. For example, as more and more PACSs began to include web-based interfaces to utilize the Internet as their means of communication, DICOM adopted Part 18 of the standard, which sets forth the requirements for making images stored on PACSs accessible over the web.

26.     This is especially useful in the radiology field, where the radiologist who is taking the image is often not the treating physician. Typically, a treating physician will refer a patient to a radiologist for imaging, but then wants to review the results themselves for diagnostic purposes. And sometimes, after being sent for imaging, a patient may be referred to a hospital or other large healthcare entity for further treatment and the hospital will also want to see the images taken in the radiologist's office. The DICOM protocol allows for all three of these providers to view the patient files. For example, a referring physician that wishes to review a patient's images will download a DICOM viewer application and use the Internet to connect to the radiologist's PACS server. Once connected, the physician can easily search for, retrieve, and view the DICOM files related to their patient.

7

27.    DICOM guidelines state that in order to protect patient data, PACS servers should never be kept directly connected to the Internet such that they are accessible without authentication (*e.g.*, a password or encryption key). Rather, PACS servers should be protected behind network security systems that monitor incoming and outgoing network traffic based on a defined set of security rules (*i.e.*, a "firewall") to prevent unauthorized access. Providers that want to offer remote access to images stored on their PACS servers should use a virtual private network ("VPN") that extends their internal PACS network over the public Internet using cryptographically secure methods that require authentication to protect patient data. They should not make DICOM images publicly available.

28.    Defendant Northeast Radiology operates an integrated PACS system that is connected to the public Internet. For example, Northeast Radiology advertises on its website that its PACS servers are available over the Internet to external referring physicians who can "quickly and securely log in to review your study" and directs physicians to call Northeast Radiology for support if they experience any issues accessing patient data remotely.

29.    Defendant Northeast Radiology also allows patients to view their test results over the Internet using a DICOM viewer.  As advertised on its website, "[p]atients at Northeast Radiology who register for our patient portal, and have compatible software, can access all of their results using our secure HIPAA compliant on-line server at any time from any place after three business days of their exam. Your physician also has on-line access to your results and images using our secure server."

30.    However, as explained below, Defendant Northeast Radiology and/or Alliance HealthCare ignored these DICOM guidelines and simply connected their network and servers to the public Internet without utilizing passwords, firewalls, or VPNs to protect patient data. *See*

Part D, below. This allowed unauthorized third parties to access patient data stored on Northeast Radiology's and/or Alliance HealthCare's PACS servers, resulting in damage to Plaintiff and the Class. *See* Part J, below.

C.    **PACSs Contain Highly Sensitive e-PHI**

31.    Unlike other file types, DICOM files stored on PACS servers allow for additional information to be embed with the imaging data. For example, a DICOM record will often contain the patient's name, date of birth, date of the examination, scope of the investigation, type of imaging procedure, the attending physician, the institute/clinic, and the number of generated images. Some institutions may also include the patient's SSN as a unique identifier so that the image files can be easily associated with the patient and are not inadvertently lost.

32.    As a result, an unauthorized third party that gains access to a PACS acquires a wealth of highly sensitive e-PHI, including not only medical images but the data embedded in those images as part of the DICOM format.

33.    Further, PACSs are often integrated with other systems such as hospital information and electronic medical records systems. These other integrated systems contain even more patient data, including a patient's demographic information such as their full name, SSN, address, employment history, family history, and financial information like credit cards and bank numbers, as well as patient's past medical history, including doctor's visits and previous diagnoses received.

34.    This information can be used for malicious purposes, including financial fraud, medical identity theft, identity theft, insurance fraud, and crafting convincing phishing messages. The U.S. Department of Health and Human Services ("HHS") has listed a number of scenarios that exploit patient data:

    a. *medical identity theft*—the use of another person's medical information to obtain a medical service;

    b. *weaponizing of medical data*—the use of sensitive medical data to threaten, extort, or influence individuals;

    c. *financial fraud*—the use of personally identifiable information contained in medical records to create credit card or bank profiles to facilitate financial fraud; and;

    d. *cyber campaigns*—the use of medical data as complementary data in future hacking campaigns.

35.     As a result, e-PHI has become increasingly valuable on the black market. For example, according to Forbes, as of April 14, 2017, the going rate for an SSN is 10 cents; a credit card number is worth 25 cents, but medical records containing e-PHI could be worth hundreds or even thousands of dollars. For example, in April of 2019, HHS estimated that the average price of medical records containing e-PHI ranged between $250 and $1,000.

36.     According to The World Privacy Forum, a nonprofit public interest group, one of the reasons for this price differential is that criminals are able to extract larger illicit profits using medical records than they are credit card or SSN. For example, while a credit card or SSN typically yields around $2,000 before being canceled or changed, an individual's e-PHI typically yields $20,000 or more. This is because, in addition to the fact that healthcare data and e-PHI are immutable (*e.g.*, you cannot cancel your medical records), healthcare data breaches often take much longer to be discovered, allowing thieves to leverage e-PHI for an extended period of time.

37.     Researchers at HealthITSecurity.com have also reported criminals selling illicit access to compromised healthcare systems on the black market, which would give other criminals "access to their own post-exploitation activity, such as obtaining and exfiltrating sensitive information, infecting other devices in the compromised network, or using connections and information in the compromised network to exploit trusted relationships between the

targeted organizations and other entities to compromise additional networks."

### D. Defendants' PACS Servers Are Not Secure

38.     In September of 2019, Greenbone Networks, a cybersecurity firm, conducted an analysis of approximately 2,300 PACS servers it was able to identify on the Internet.

39.     Of these 2,300 PACS servers, 590 allowed for e-PHI to be freely accessed using a publicly available DICOM viewer, *i.e.*, users were not required to enter a password, provide a certificate, or circumvent any other protective measures to access patient data. In 39 instances, e-PHI was transmitted from the PACS server as unencrypted plain text, making it readable to anyone on the Internet, without the need for a DICOM viewer.

40.     As one cybersecurity researcher put it, accessing e-PHI on the 590 unprotected PACS servers Greenbone discovered was "not even hacking. It's walking into an open door."

41.     One of the PACS servers providing open access to patient data belonged to Defendant Northeast Radiology and/or Alliance HealthCare. Greenbone identified Defendant Northeast Radiology and/or Alliance HealthCare as having the largest cache of unsecured medical data in the U.S. with more than 61 million images from approximately 1.2 million patients' records unencrypted, and accessible without a password, through the public Internet

42.     Greenbone found that the files stored on the 590 unsecured PACS servers (like those operated by Defendants) contained extremely sensitive e-PHI, including patient names, birthdays, dates of examinations, descriptions of treatment and procedures performed, the identity of attending physicians, name of the institute or clinic, and number of generated images.

43.     Greenbone estimates that the value of this data would exceed $1 billion on the "dark web," where criminals buy and sell stolen personal information.

**E.      Defendants Failed to Comply with HIPAA, the National Standard for
Protecting Private Health Information**

44.      HIPAA requires the healthcare industry to have a generally accepted set of

security standards for protecting health information. HIPAA defines Protected Health

Information ("PHI") as individually identifiable health information and e-PHI as PHI that is

transmitted by electronic media or maintained in electronic media. This protected information

includes: names; dates; phone numbers; fax numbers; email addresses; SSNs; medical record

numbers; health insurance beneficiary numbers; account numbers; certificate/license numbers;

vehicle identifiers; device identifiers and serial numbers; URLs; IP addresses; biometric

identifiers; photographs; and any other unique identifying number, characteristic, or code.

45.      To this end, HHS promulgated the HIPAA Privacy Rule in 2000 and the HIPAA

Security Rule in 2003. The security standards for the protection of e-PHI, known as "the Security

Rule," establish a national set of security standards for protecting certain health information that

is held or transferred in electronic form. The Security Rule operationalizes the protections

contained in the Privacy Rule by addressing the technical and non-technical safeguards that

organizations called "covered entities" must put in place to secure individuals' e-PHI.

46.      Defendants Northeast Radiology and Alliance HealthCare are either entities

covered by HIPAA, *see* 45 C.F.R. § 160.102, or "business associates" covered by HIPAA, *see* 45

C.F.R. § 160.103, and therefore must comply with the HIPAA Privacy Rule and Security Rule,

*see* 45 C.F.R. Part 160 and part 164, Subpart A and E.

47.      HIPAA limits the permissible uses of PHI and prohibits the unauthorized

disclosure of PHI.  45 C.F.R. § 164.502.  HIPAA also requires that covered entities implement

appropriate safeguards to protect this information.  *See* 45 C.F.R. § 164.530(c)(1).

48.    The electronically stored images and healthcare information accessed by unauthorized third parties on Defendant Northeast Radiology's and/or Alliance HealthCare's PACS servers are e-PHI under the HIPAA Privacy Rule and the Security Rule, which protects all e-PHI a covered entity "creates, receives, maintains or transmits in electronic form." 45 C.F.R. § 160.103.

49.    The Security Rule requires covered entities, including Defendants Northeast Radiology and Alliance HealthCare, to implement and maintain appropriate administrative, technical, and physical safeguards for protecting e-PHI.  *See* 45 C.F.R. § 164.530(c)(1). Among other things, the Security Rule requires Northeast Radiology and Alliance HealthCare to identify and "[p]rotect against reasonably anticipated threats or hazards to the security or integrity of [the] information" and "[p]rotect against reasonably anticipated, impermissible uses or disclosures." 45 C.F.R. § 164.306

50.    HIPAA also obligates Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, *see* 45 C.F.R. § 164.308(a)(1)(i).

51.    HIPAA further obligates Defendants to ensure that their workforces comply with HIPAA security standard rules, see 45 C.F.R. § 164.306(a)(4), to effectively train their workforces on the policies and procedures with respect to protected health information, as necessary and appropriate for those individuals to carry out their functions and maintain the security of protected health information, 45 C.F.R. § 164.530(b)(1).

52.    Defendants failed to comply with these HIPAA rules. Specifically, Northeast Radiology and Alliance HealthCare failed to put in place the necessary technical and non-technical safeguards required to protect Plaintiff and other Class Members' e-PHI and, moreover,

failed to correct those deficiencies after Greenbone Networks notified Defendants that they were able to access e-PHI stored on Defendants' PACS servers from the Internet.

**F.      Defendants Failed to Notify Plaintiff and Class Members of the Breach**

53.      Moreover, HIPAA requires that covered entities, including Northeast Radiology and Alliance HeathCare, provide notice to patients of unauthorized access to e-PHI. *See* 45 C.F.R. § 160.404. Thus, Defendants had a duty to notify, in a timely manner, patients of breaches that occurred when e-PHI was accessed in a manner not permitted under the Privacy and Security Rules, including when Greenbone researchers accessed Defendants' PACS servers.

54.      Greenbone's unauthorized access to Northeast Radiology's PACS servers is just one example of a "breach" which is defined in 45 C.F.R. § 164.402 to include the acquisition, *access*, use, or *disclosure* of protected health information.

55.      The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information. Similar breach notification provisions implemented and enforced by the Federal Trade Commission ("FTC"), apply to vendors of personal health records and their third-party service providers, pursuant to section 13407 of the HITECH Act.[1]

56.      The International Organization for Standardization and the International Electrotechnical Commission (ISO/IEC) define a data breach as a compromise of security that leads to the accidental or unlawful destruction, loss, alteration, *unauthorized disclosure of, or access* to protected data transmitted, stored or otherwise processed.[2]

---

[1] Additionally, the California Medical Information Specific Breach Notification Statute (Cal. Health & Safety Code § 1280.15) requires health clinics to report, directly to the patient, any "unauthorized access" to a patient's medical information.

[2] ISO/IEC 27040.

57.     Under 45 C.F.R. § 164.404, "[a] covered entity shall, following the discovery of a breach of unsecured protected health information, notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, *accessed*, acquired, used, or disclosed as a result of such breach."

58.     Therefore, Defendants Northeast Radiology and Alliance HealthCare should have informed Plaintiff and Class Members of breaches to Defendants' system and unauthorized access of patients' files, including when Defendants learned that Greenbone was able to access unsecured patient records on their system without authorization.

59.     Defendants had a duty to notify their patients, in a timely manner, that Defendants' servers were accessed, and e-PHI was disclosed in a manner not permitted under the Privacy and Security Rules. This duty extended to Plaintiff and each individual whose unsecured protected health information has been or is reasonably believed by the covered entity to have been, accessed, acquired, used, or disclosed as a result of such breach.

**G.     Defendants Failed to Comply with Federal Trade Commission Requirements**

60.     Defendants Northeast Radiology and Alliance HealthCare were (and still are) prohibited from engaging in "unfair or deceptive acts or practices in or affecting commerce" by the Federal Trade Commission Act, 15 U.S.C. § 45. Their failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice that violates this rule.

61.     In 2007, the FTC published guidelines establishing reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's

vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

62.    The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

63.    Defendants Northeast Radiology and Alliance HealthCare failed to follow the FTC guidelines and failed to adequately secure patient data stored on their PACS servers. Furthermore, by failing to have reasonable data security measures in place, Northeast Radiology and Alliance HealthCare engaged in an unfair act or practice within the meaning of §5 of the FTC Act.

### H.    Defendants Violated Their Common Law Duty of Reasonable Care

64.    In addition to obligations imposed by federal and state law, Defendants owed and continue to owe a common law duty to Plaintiff and Class Members—who entrusted Northeast Radiology and/or Alliance HealthCare with sensitive e-PHI—to exercise reasonable care in receiving, maintaining, storing, and deleting the e-PHI in Defendants' possession.

65.    Defendants owed and continue to owe a duty to prevent Plaintiff's and Class Members' e-PHI from being compromised, lost, stolen, accessed, or misused by unauthorized third parties. An essential part of Defendants' duty was (and is) the obligation to provide reasonable security consistent with current industry best practices and requirements, and to ensure information technology systems and networks, including the PACS servers, in addition to

the personnel responsible for those systems and networks, adequately protected and continue to protect Plaintiff's and Class Members' e-PHI.

66.     Defendants owed a duty to Plaintiff and Class Members, who entrusted Defendants with extremely sensitive e-PHI, to design, maintain, and test the information technology systems, including the PACS servers that housed Class Members' e-PHI, to ensure that the e-PHI in Defendants' possession was adequately secured and protected.

67.     Defendants owed a duty to Plaintiff and Class Members to create, implement, and maintain reasonable data security practices and procedures sufficient to protect the e-PHI stored in Defendants' PACS servers and other computer systems. This duty required Defendants to adequately train employees and others with access to Class Members' e-PHI on the procedures and practices necessary to safeguard such sensitive information.

68.     Defendants owed a duty to Plaintiff and Class Members to implement processes that would enable Defendants to timely detect a breach of its information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

69.     Defendants owed a duty to Plaintiff and Class Members to disclose when and if Defendants' information technology systems, including any PACS servers, and data security practices were not sufficiently adequate to protect and safeguard Class Members' e-PHI.

70.     Defendants owed a duty to Plaintiff and Class Members to timely disclose the fact that a data breach, resulting in unauthorized access to their e-PHI, had occurred.

I.     **Defendants Failed Comply With Their Own HIPAA Privacy Policy**

71.     Northeast Radiology has dedicated a section of its website to apprise its customers, including Plaintiff and Class Members, of the permissible uses and disclosure of their

medical records.[3]  More specifically, Northeast Radiology posts on its website, the Notice of

Privacy Practices ("Privacy Practices"), which Defendants Northeast Radiology and Alliance

HealthCare admit they are required to comply with ("We [meaning Alliance HealthCare and its

affiliates, such as Northeast Radiology] are also required to comply with this Notice of Privacy

Practices").

72.    At all relevant times, the Privacy Practices defined "Protected Health

Information" broadly, as "information about [the patient], including demographic information,

that may identify [the patient] and that relates to [the patient's] past, present, or future health care

related services."  Accordingly, the definition of Protected Health Information in Defendants'

Privacy Practices is consistent with HIPAA, and as such, it encompasses PHI and e-PHI,

including the personal information Plaintiff Cohen provided to Northeast Radiology, such as his

name, address, and SSN, all of which fall squarely within the protections provided for by the

Privacy Practices.

73.    Defendants' Privacy Practices also list the permitted uses and disclosures of

patients' e-PHI and informs patients that e-PHI will be used only "***to support [patients'] care***

***and treatment, to ensure that we will receive payment for charges, and to support our***

***administrative operations***."  The Privacy Practices further specify that the e-PHI will only be

disclosed if such disclosure is necessary for: (i) treatment, including sharing information with

other physicians necessary to diagnose and treat the patient's condition; (ii) payment, including

determination of insurance coverage eligibility, verification of patient's insurance benefits,

determination of medical of necessity, and insurance billing; and (iii) health care operations,

---

[3] Northeast Radiology, Notice of Privacy Practices, effective Aug. 23, 2013, available at
https://www.nerad.com/hippaa/, (last accessed Feb. 11, 2020).

including coordination with business partners and suppliers and the making of appointments for

patient's medical procedures.  Critically, none of the permissible uses of e-PHI include granting

unrestrained access to unauthorized third parties who intend to misuse such information for illicit

purposes.

74.      Defendants' Privacy Practices assure consumers, such as Plaintiff and Class

Members, of their "***opportunity to impose limitations on [the] use and disclosure [of personal***

***information]"*** in circumstances when the information is not routinely permitted to be disclosed.

These include sharing of information with "members of [the patient's] immediate family, other

relatives, or [patient's] legally designated health care decision maker."  To that effect, the

Privacy Practices provide: "***You may prevent this disclosure or you may seek to limit it.***  You

may also designate someone other than those listed above (such as close personal friend) to

whom we may disclose your [e-PHI]."

75.      The Privacy Practices warned consumers of certain limited situations of

compelled disclosures when patients' information may be disclosed without their ability to object

to such disclosure—none of which apply to the circumstances here—including: (i) when the

disclosure is required by law; and (ii) to demonstrate Defendants' compliance with laws in cases

when non-compliance is suspected.

76.      For all other situations—*i.e.*, those not covered by routine or compelled

disclosure—Defendants Privacy Practices explicitly promised that any "***use or disclosure of***

***[patient's e-PHI] will occur only with [the patient's] written authorization*** [including] requests

[patients] make to Alliance , as well as those [Defendants] may receive from third parties."  The

Privacy Practices further assuaged patients' concerns regarding unauthorized disclosure of their

personal information by allowing them to revoke any written authorizations: "***You may later revoke your authorization, in writing, if you change your mind.***"

77.    By these representations in the Privacy Practices, Defendants have affirmatively—and misleadingly—assured patients, including Plaintiff and the Class Members, that they had the ability to control the dissemination of their e-PHI and to restrict its use and access by third parties. The Privacy Practices also expressly guaranteed to safeguard patients' e-PHI consistent with the applicable laws and regulations.

78.    The Privacy Practices also expressly informed its customers, including Plaintiff and the Class Members, that they had the right to be notified of a breach of their unsecured private information, including instances of unauthorized ***access*** to patient's unsecured data.  To that effect, the Privacy Practices conspicuously stated:

> <u>**You have the right to be notified of a breach of your unsecured Protected Health Information**</u>. Alliance will notify you in writing of any such breach (i.e., an unauthorized acquisition, access, use, or disclosure) of your unsecured (i.e., unencrypted) [e-PHI].[4]

79.    Thus, Defendants Alliance HealthCare and Northeast Radiology were well aware of their duty to restrict the dissemination of Plaintiff's and Class Members' e-PHI, and to notify Plaintiff and Class Members of the unauthorized access by third parties to Plaintiff's and Class Members' personal information.  Nevertheless, Defendants failed to comply with their own policies by failing to adequately protect Plaintiff's and Class Members' e-PHI and to notify them of the breach of their e-PHI stored on Defendants' servers.

---

[4] Emphasis in original.

**J.    Plaintiff Was Injured by Defendants' Failure to Protect Plaintiff's e-PHI**

80.    Defendants failure to protect Plaintiff's e-PHI has not only caused Plaintiff to suffer injury, including monetary loss, but has put Plaintiff at constant risk of future harm resulting from the misuse of highly sensitive personal information.

81.    The injuries suffered by Plaintiff are a direct and proximate result of Defendants' failure to protect Plaintiff's e-PHI and include:

a)    theft of his personal and financial information;

b)    use of his e-PHI to withdraw money from his bank account;

c)    use of his e-PHI for fraudulent loan applications;

d)    damage to his credit score;

e)    costs associated with the detection and prevention of identity theft and unauthorized use of his e-PHI and bank accounts;

f)    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of Defendants' actions, including finding fraudulent charges, and locking credit reports;

g)    the imminent and certain impending injury flowing from fraud and identify theft posed by his e-PHI being placed in the public domain;

h)    damages caused by Defendants' failure to notify Plaintiff about the breach in accordance with HIPAA and their own Policy.

82.    Victims of medical identify theft, like Plaintiff and Class Members, are at constant risk of various types of fraud, including: unauthorized withdrawal of money from a victim's bank account; the use of e-PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; or, the filing of a fraudulent tax return using the victim's information. In

addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

83.     Given the severity of these harms it is no surprise that The Fifth Annual Study on Medical Identity Theft conducted by the Ponemon Institute concluded that medical identity theft costs the average victim $13,500 to fix.

84.     But for Northeast Radiology's failure to secure Plaintiff's records, Plaintiff would not have suffered, and continued to suffer, the harm listed above.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff, Bryan Cohen, brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and all others similarly situated, as representative of the following class:

> All persons whose e-PHI was maintained on Northeast Radiology's and/or Alliance HealthCare's unsecured PACS server(s) ("the Class").

86.     Excluded from the Class are affiliates, predecessors, successors, officers, directors, agents, servants, or employees of Defendants, and the immediate family members of such persons. Also excluded are any trial judge who may preside over this action and their law clerks, court personnel and their family members, and any juror assigned to this action.

87.     Plaintiff reserves the right to amend the Class definition if discovery and/or further investigation reveal that it should be modified.

88.     **Numerosity:** The members of the Class are so *numerous* that the joinder of all members of the Class in single action is impractical. For example, Greenbone researches found more than 61 million images relating to approximately 1.2 million Northeast Radiology and/or Alliance HealthCare patients. These Class Members are readily identifiable from

information embedded within these images and/or from other records in Defendants'

possession, custody, or control.

89.    **Commonality and Predominance:** There are *common questions of law and*

*fact* to the Class Members, which *predominate* over any questions affecting only individual

Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendants owed a duty to Plaintiff and Class Members to secure and safeguard their e-PHI;

b.    Whether Defendants failed to use reasonable care and reasonable methods to secure and safeguard Plaintiff and Class Members' e-PHI;

c.    Whether Defendants properly implemented security measures as required by HIPAA or any other laws or industry standards to protect Plaintiff and Class Members' e-PHI from unauthorized access, capture, dissemination and misuse;

d.    Whether Plaintiff and members of the Class were injured and suffered damages and ascertainable losses as a result of Defendants' actions or failure to act;

90.    **Typicality:** Plaintiff's claims are *typical* of those of other Class Members

because Plaintiff's e-PHI, like that of every other Class Member, was improperly accessed as

a result of Defendants' misconduct, and Plaintiff suffered damages as a result.

91.    **Adequacy of Representation:** Plaintiff will fairly and *adequately represent*

and protect the interests of the Class. Plaintiff has retained competent counsel experienced in

litigation of complex class actions. Plaintiff intends to prosecute this action vigorously.

Plaintiff's claims are typical of the claims of all of the other Class Members, and Plaintiff has

the same non-conflicting interests as the other Class Members whose e-PHI was accessed

without authorization. Therefore, the interests of the Class Members will be fairly and

adequately represented by Plaintiff and his counsel.

92.    **Predominance and Superiority:** A class action is *superior* to other available

methods for the fair and efficient adjudication of this controversy. The adjudication of this

23

controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting damages in the aggregate would go un-remedied.

## CLAIMS FOR RELIEF

### COUNT I
**(Negligence)**
**(Against All Defendants)**

93.     Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

94.     Defendants Northeast Radiology and Alliance HealthCare owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting their e-PHI from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties.

95.     This duty included, among other things, maintaining, adequate security systems to ensure that Plaintiff's and Class Members' e-PHI was adequately secured and protected.

96.     Defendants Northeast Radiology and Alliance HealthCare had a duty to implement processes that would detect a breach of their security system in a timely manner so that victims of a breach, including Plaintiff and Class Members, could take actions to protect themselves from identity theft.

97.     Defendants Northeast Radiology and Alliance HealthCare further had a duty to

24

timely notify patients, including Plaintiff and Class Members, that their e-PHI had been accessed in a data breach.

98.    Defendants Northeast Radiology's and Alliance HealthCare's duty to timely disclose to Plaintiff and Class Members that their e-PHI had been accessed by unauthorized third parties was necessary so that, among other things, Plaintiff and Class Members could take appropriate measures including, transferring their records to a different provider who maintained adequate security controls, obtaining credit and/or identify theft monitoring protection, canceling or changing their bank account and/or debit or credit card information, or other appropriate precautions.

99.    These duties arise from several sources, including, but not limited to, the HIPAA and FTC guidelines described in Parts E, F and G above, along with a common law duty to prevent the foreseeable risk of harm to others, including Plaintiff and the Class.

100.    It was certainly foreseeable to Northeast Radiology and Alliance HealthCare that injury would result from a failure to use reasonable measures to protect their patient's e-PHI.

101.    Northeast Radiology and Alliance HealthCare breached their duty to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' e-PHI by failing to adopt, implement, and maintain adequate security measures to safeguard that information; allowing unauthorized access to Plaintiff's and Class Members' e-PHI maintained by Northeast Radiology.

102.    Northeast Radiology and Alliance HealthCare breached their duty to timely disclose that Plaintiff's and Class Members' e-PHI had been accessed, and that it had been unsecured and accessible to unauthorized third parties.

103.    Defendants' failure to comply with industry regulations and inform customers of the data exposure further evidence their negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' e-PHI.

104.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, they would not be at risk of having their e-PHI compromised, stolen, and viewed by unauthorized persons.

105.    The injury and harm suffered by Plaintiff and Class Members as a result of identity theft was the reasonably foreseeable result of Northeast Radiology's and Alliance HealthCare's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' e-PHI. Northeast Radiology knew or should have known that their systems and technologies for storing Plaintiff's and Class Members' e-PHI allowed that information to be accessed by unauthorized third parties.

106.    The HIPAA Security Rule requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all e-PHI they create, receive, maintain or transmit; (b) proactively identify and protect against reasonably anticipated threats to the security or integrity of the information; (c) protect against reasonably anticipated, impermissible uses or disclosures; (d) put in place the required administrative, physical and technical safeguards; (e) implement policies and procedures to prevent, detect, contain, and correct security violations; (f) effectively train their workforce regarding the proper handling of e-PHI; and (g) designate individual security and privacy officers to ensure compliance.

107.    Greenbone's ability to access e-PHI stored on Defendants' PACS confirms that Northeast Radiology and Alliance HealthCare negligently failed to abide by the HIPAA Security Rule by, among other things, failing to protect against anticipated threats to the security or

26

integrity of Plaintiff and Class Members' e-PHI, and any reasonably anticipated, impermissible uses or disclosures of their e-PHI.

108.   Defendants' also had a duty to use reasonable data security measures under §5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect consumer data.

109.   In connection with the conduct described above, Defendants acted wantonly, recklessly, and with complete disregard for the consequences Plaintiff and Class Members would suffer if their e-PHI was accessed by unauthorized third parties.

110.   As a result of Defendants' negligence, Plaintiff and Class Members incurred damages including, but not limited to, out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or fraud; credit, debit, and financial monitoring to prevent and/or mitigate theft, identity theft, and/or fraud incurred or likely to occur as a result of Defendants' security failures; the value of their time and resources spent mitigating the identity theft and/or fraud; the cost of and time spent replacing credit cards and debit cards and reconfiguring automatic payment programs with other merchants related to the compromised information; and irrecoverable financial losses due to unauthorized withdrawals from bank accounts and charges to credit or debit cards of Defendants' customers by identity thieves who wrongfully gained access to the e-PHI of Plaintiff and Class Members.

## COUNT II
### (Negligence *Per Se*)
### (Against All Defendants)

111.   Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

112.    The HIPAA Security Rule requires Defendants Northeast Radiology and Alliance HealthCare to maintain reasonable and appropriate administrative, technical, and physical safeguards for protecting e-PHI which Defendants negligently failed to implement. The HIPAA Security Rule requires Defendants to protect against reasonably anticipated threats to the security or integrity of the information and protect against reasonably anticipated, impermissible uses or disclosures, which Defendants negligently failed to do. 45 C.F.R. Part 160 and part 164, Subpart A and E.

113.    Plaintiff and Class Members, as patients of Northeast Radiology and/or Alliance Healthcare, are within the class of persons the HIPAA Security Rule was intended to protect. The harm that has occurred is the type of harm the HIPAA Security Rule was intended to guard against.

114.    Northeast Radiology and/or Alliance HealthCare did not notify Plaintiffs and Class Members of breaches alleged herein as required by the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414.

115.    Defendants failure to secure Plaintiff's and Class Members e-PHI and to notify them that such information had been accessed by unauthorized third parties violated at least the following HIPAA regulations:

    A) The HIPAA Privacy and Security Rule 45 C.F.R. § 160 and 45 C.F.R. § 164, Subpart A and E

- 45 C.F.R. § 164.306

- 45 C.F.R. § 164.308

- 45 C.F.R. § 164.312

- 45 C.F.R. § 164.314

- 45 C.F.R. § 164.502

- 45 C.F.R. § 164.530

B) The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414

- 45 C.F.R. § 164.404

116.    Defendants' violations of HIPAA constitute negligence *per se*.

117.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as Northeast Radiology's failing to use reasonable measures to protect e-PHI.

118.    Northeast Radiology and Alliance HealthCare violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' e-PHI and not complying with industry standards. Defendants' conduct was particularly egregious given the nature and amount of e-PHI it obtained and stored and the foreseeable consequences of a data breach in a database with more than 61 million images associated with 1.2 million patients across its five offices.

119.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect because they paid Defendants for radiological and/or medical goods and services. The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.

120.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

121.    Moreover, the fact that patient data stored on Northeast Radiology's and/or Alliance HealthCare's PACS servers were unencrypted and could be accessed from the public Internet and viewed without a password or other credentials in violation of HIPAA and FTC

guidelines, on its own, demonstrates that Defendants were negligent *per se*.

122.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

<u>**COUNT III**</u>
**(Breach of Contract)**
**(Against All Defendants)**

123.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

124.    Defendants expressly promised to safeguard Plaintiff's and Class Member's e-PHI. Specifically, Northeast Radiology and Alliance HealthCare promised to abide by their HIPAA privacy policy, which they provided to patients and customers. *See* ¶ 71-77, above.

125.    This policy applied Plaintiff and Class Members, who entered into a contract with Defendants when they provided their e-PHI to Northeast Radiology and/or Alliance HealthCare as part of a transaction in which they paid money for radiological and/or medical goods and services.

126.     Plaintiff and Class Members fully performed their obligations under the contracts with Defendants, including by paying for the radiological and/or medical goods and service Defendants provided.

127.    Defendants did not hold up their end of the bargain. In entering into such contracts, Defendants agreed to protect Plaintiff and Class Members e-PHI in accordance with State and federal law, their HIPAA privacy policy and industry standards. Defendants also agreed to notify Plaintiff and Class Members of a breach of their e-PHI.

128.    Defendants failed on both accounts: they failed to take reasonable steps to

protect Plaintiff and Class Members e-PHI, and failed to notify Plaintiff and Class Members when their systems were breached in accordance with, among other things, their own HIPAA privacy policy. *See* ¶ 78, above. Each of these acts constituted a separate breach of the contracts Defendants entered with Plaintiff and Class Members.

129.    Plaintiff and Class Members would not have entrusted Defendants with their e-PHI in the absence of the contract between them and Defendants, obligating Defendants to keep this information secure and provide notice in the event of a breach.

130.    As a direct and proximate result of Defendants' breaches of their contracts, Plaintiff and Class Members did not receive the full benefit of their bargain and instead received services that were less valuable than what they paid for. Plaintiff and Class Members were damaged in an amount at least equal to this overpayment.

131.    Also as a result of Defendants' breaches of their contracts, Plaintiff and Class Members sustained actual losses and damages, including, but not limited to, out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or fraud; credit, debit, and financial monitoring to prevent and/or mitigate theft, identity theft, and/or fraud incurred or likely to occur as a result of the breach of Defendants' systems; the value of their time and resources spent mitigating the identity theft and/or fraud; the cost of and time spent replacing bank accounts, credit cards and debit cards and reconfiguring automatic payment programs with other merchants related to the compromised cards; and irrecoverable financial losses due to fraudulent withdrawals from the bank accounts, and fraudulent charges to credit and debit cards of Defendants' customers by identity thieves who wrongfully gained access to the e-PHI of Plaintiff and Class Members.

**COUNT IV**
**(For Violation of New York's Uniform Deceptive Trade Practices Act)**
**(Gen. Bus. Law § 349 *et seq.*)**
**(Against All Defendants)**

132.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

133.    As a consumer of Northeast Radiology's and Alliance HealthCare's services, Plaintiff is authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h) ("GBL § 349(h)").

134.    Plaintiff is a "person" within the meaning of GBL § 349.

135.    Plaintiff and Class Members provided their e-PHI to Northeast Radiology pursuant to transactions in "business" "trade" or "commerce" as meant by GBL § 349.

136.    The GBL prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

137.    This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts related to the breach alleged herein. For example:

138.    Defendants engaged in unlawful and deceptive acts and practices in the conduct of trade or commerce and furnishing of services purchased by Plaintiff and the Class in violation of GBL § 349, including but not limited to the following:

a.  Defendants failed to implement adequate privacy and security measures to protect Plaintiff's and Class Members' e-PHI from unauthorized access, release, and theft, which was a direct and proximate cause of Plaintiff's harm;

b.  Defendants' representation that they would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class Members' e-PHI from unauthorized access, release, and theft was unfair and deceptive given the inadequacy of its privacy and security protections; and

c.  Defendants omitted, suppressed, and concealed the material fact of the inadequacy of their privacy and security protections for Class Members' e-PHI;

d.  Defendants' negligence in failing to disclose the material fact of the inadequacy of its privacy and security protections for Plaintiff and Class Members e-PHI was deceptive in light of representations that they would comply with, among other things, HIPAA.

e.  Defendants engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Class Members' e-PHI, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in Plaintiff's and the Class' medical data being accessed by unauthorized third parties. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45) and HIPAA;

139.  The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

140.  Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' e-PHI and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and reckless with respect to the rights of members of the Class.

141.  Plaintiff and Class Members relied on Defendants' deceptive acts and practices when they paid money in exchange for goods and services and provided their e-PHI to Northeast Radiology for medical treatment.

142.  Plaintiff and Class Members relied on Defendants to safeguard and protect their e-PHI and to timely and accurately notify them if their data had been accessed by unauthorized third parties.

143.  Plaintiff and Class Members seek all available relief under the New York GBL § 349 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Bryan Cohen, individually and on behalf of the Class,

respectfully requests that the Court:

A. Certify the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and order that notice be provided to all Class Members;

B. Designate Plaintiff as representative of the Class and the undersigned counsel, LOWEY DANNENBERG, P.C. as Class Counsel;

C. Award Plaintiff and the Class actual damages, compensatory damages, and statutory damages in an amount to be determined by the Court and treble and punitive damages to punish Defendants' egregious conduct as described herein, and to deter Defendants and others from engaging in similar conduct;

D. Award Plaintiff and the Class injunctive relief, as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices set forth herein, ordering Defendants to fully disclose the extent and nature of the security breach and theft, and ordering Defendants to pay for identity theft and credit monitoring services for Plaintiff and the Class;

E. Award Plaintiff and the Class statutory interest and penalties;

F. Award Plaintiff and the Class their costs, prejudgment and post judgment interest, and attorneys' fees; and

G. Grant such other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so

triable.

Dated:  February 11, 2019                        Respectfully submitted,
White Plains, New York
                                                 LOWEY DANNENBERG P.C.

                                                 /s/ Vincent Briganti
                                                 Vincent Briganti
                                                 Christian Levis
                                                 Andrea Farah
                                                 Henry Kusjanovic
                                                 Bracha Gefen
                                                 44 South Broadway, Suite 1100
                                                 White Plains, NY 10601
                                                 Tel.: (914) 997-0500
                                                 Fax: (914) 997-0035
                                                 Email: vbriganti@lowey.com
                                                        clevis@lowey.com
                                                        afarah@lowey.com
                                                        hkusjanovic@lowey.com
                                                        bgefen@lowey.com

                                        *Attorneys for Plaintiff Bryan Cohen and the Proposed Class*